Birdie Amsterdam, J.
This proceeding has been brought under subdivision 1 of section 4 of the Business Bent Law (L. 1945, ch. 314, as amd.), to increase the rent of business space. The area involved constitutes a doctor’s office at premises No. 1050 Park Avenue, in the borough of Manhattan, city of New York.
The building is a 14-s'tory penthouse and basement structure, with two passenger and two service elevators, situate at the southwest corner of Park Avenue and Bast 87th Street, on a plot fronting 100'8%" on the Avenue and 133'4" on 87th Street. Otherwise a residential building, four of the five units on the main floor are used as doctors’ offices. The subject office has an entrance from the building lobby on Park Avenue. The other doctors’ offices have separate entrances on the 87th Street side.
The proceeding was commenced in May, 1957. In the bill of particulars are set forth the expenses and the actual rental income of the property for the year preceding April 30, 1957.
Prime issues to be determined question whether the landlord petitioner was earning a reasonable return on the fair value of the entire property and, if he was not, what percentage of a reasonable return should be paid by this tenant respondent.
In resolving these questions, it becomes necessary to ascertain, in gross, the total income and total cost of maintenance and operation for the year in question, whether or not contained in the full year’s operation set forth in landlord petitioner’s bill of particulars. Such considerations embrace actual income and expenses, as well as prospective increases that were fixed and determined as to liability or obligation prior to the commencement of this proceeding (Matter of Alibel Corp. [Compo Shoe], 285 App. Div. 140, 143).
Under the guide of construction enunciated in the Alibel case (supra) which was approved by the Court of Appeals in the Matter of Trustees of Masonic Hall & Asylum Fund (Liggett Drug Co.) (1 N Y 2d 616) it clearly appears that the landlord petitioner’s bill of particulars should be revised. Anent income, the evidence established that, in addition to the actual annual income set forth in the bill of particulars, amounting *167 to $216,294.31, the landlord petitioner also received $144.11 from concessions for basement laundry machines. Too, on April 29, 1957, the Temporary State Housing Rent Commission awarded the landlord a rental increase of $506.04 on one of the apartments, effective June 1, 1957. Since this was an increase ‘ having prospective effect but fixed in amount and determined as to obligation or liability prior to the filing of the petition”, this projected increase is to be considered in arriving at the gross annual income. The latter amount thus becomes $216,944.46. Post-petition rental increases not fixed in amount nor effective during the year ending April 30, 1957, are not allocable thereunto within the purview of the Alibel case (supra).
As concerns expenses with which the landlord should be credited, his bill of particulars asserts a total of $153,438.87. During the trial, however, he urged additional “projected” expenses. The tenant objected to certain items of expense alleged in the bill of particulars, as well as to the proposed “projected” expenses. At the opening of the trial it was stipulated that the following items be reduced: “Miscellaneous ” by $267.65 to $1,011.60; “Repairs and Maintenance” by $125 to $9,163.95; and “ Insurance ” by 41 cents to $2,728.54. The following items were not questioned: “ Water ”, $1,441.50; “Sewer”, $480.50; “Painting and Decorating ”, $13,965.17; “Supplies”, $1,337.47; “ Insurance ”, $2,728.54; and “Telephone ”, $257.74.
Dispute exists as to the items of “ Payroll” and the interrelated items of “ Payroll Taxes and Compensation Insurance ” and “ Uniforms ”, which are listed, respectively, in the bill of particulars, as $48,740.48, $4,553.40 and $979.91. The testimony disclosed that under the provisions of a union contract which was in effect during the year ending April 30, 1957, it became necessary for the landlord to reduce the work week of the building service employees from 44 hours to 40 hours, effective as of April 20, 1957. It was stipulated that in effectuating this shorter week the “ Payroll ” of the building rose to $54,920 and the “Payroll Taxes and Compensation Insurance ” became $5,200. Again applying the Alibel rule (supra) the figures for these items as set forth in the landlord’s bill of particulars should be increased by $6,179.52 and $646.60, respectively. Consequently, since the “Payroll” is increased to allow for these prospective changes by the amounts indicated, the issue raised by the tenant that the “Payroll” item in the bill of particulars included 53 weeks of payroll becomes academic.
*168 The tenant further contends that in computing the ‘ Payroll” and interrelated items of “ Payroll Taxes and Compensation Insurance ” and “ Uniforms ”, the cost of elevator services should not be chargeable or applicable to the doctors’ rents since the elevators do not service their offices. I find no force to that contention, for, in computing gross income, both the gross residential income as well as that of the business space has been urged by the tenant and has been used. The payroll for running these elevators and the afore-mentioned interrelated items were normal charges for furnishing normal service to the residential tenants. Without such service, conceivably, the landlord could not have obtained the rents which he was collecting. Furthermore, the specific language of the statute provides that, in fixing a rent in excess of the emergency rent, “ due consideration shall be given to the cost of maintenance and operation of the entire property (including land and building or other rental area in which such business space is located) ” (Business Rent Law, § 4, subd. 1). Thus, to eliminate expense of elevator service in the instant proceeding would be improper and unwarranted.
The landlord urges that the “Payroll” item should be increased by $5,000, to allow for the salary of a superintendent. That the “Payroll” item in the bill of particulars referred only to the elevator operators, porters, relief men and handyman was established by the evidence. A Mr. Pratt, called on behalf of the landlord, testified that he (Pratt) acted in the dual capacity of both superintendent and building manager; that he received the sum of $8,828.40 for the year ending April 30, 1957, of which his annual compensation was $7,300 and the balance was for commissions for leasing. In his bill of particulars the landlord listed this item of expense under the item, “Management Salary”. Technically, $5,000 hereof should be regarded as a “ Payroll ” expense. In applying it, therefore, the “ Payroll ” item is increased to $59,520 and the “ Management Salary” item is reduced to $3,828.40, concerning which last I shall hereinafter make reference to.
In considering the remaining items, the inclusion or correctness of which the tenant challenges or questions, it appears that “Fuel” covers a 13-month period. Consequently, the March, 1956 bill amounting to $1,207.18, which is prior to the base year period, is disallowed and ‘ ‘ Fuel ’ ’ is reduced to $8,891.33; “Repairs and Maintenance” is reduced by $261.87 (which was for an August, 1955 bill) to $8,902.08; “ Electricity and Cas ” is reduced by $630 (which was for two bills covering the period between January 25, 1956 and March 27, 1956, *169 which, likewise, is outside the test year) to $4,148.82; “ Legal and Auditing ” for $549.22, ‘ ‘ Management Salary” for $3,828.40 (heretofore referred to, which Pratt testified included leasing commissions) and “ Miscellaneous ” for $1,011.60 are all allowed as being normal and necessary in the regular operation of the building. ■ However, the separate item of $327.75 in landlord’s bill of particulars for “ Leasing commissions ”, which was in connection with a 1955 year lease, is disallowed. In the conduct of a realty enterprise, recognition should be given to the circumstance that reasonable legal fees, accounting fees, management fees, leasing commissions and miscellaneous expenses are frequently necessary.
Summarizing and adjusting the items of expense in the bill of particulars to conform to the foregoing, I find the normal annual operating charges allowable to the landlord petitioner to be $157,394.78.
The statute provides, in substance, that the assessed valuation of the entire property, including land and building, shall be presumed to be the fair value of the premises. For the purposes of this proceeding, the respective parties agreed that the assessed value shall be controlling. However, there is dispute as to whether the 1956/1957 assessment of $1,050,000 or the 1957/1958 assessment of $1,075,000 should prevail. It appears that the 1957/1958 assessment was fixed by the tax commission on February 1, 1957, and taxed at $43,752.50. The testimony established that no application had been filed with the tax commission to reduce this assessment, nor was any court or other proceeding pending for a reduction. So that, prior to the commencement of the instant proceeding, the 1957/1958 assessment was fixed and determined. Consequently, that figure is adopted as the value of the property for computing a fair return. The statute further provides that an annual return of 8% on the fair value of the entire property is presumed to be reasonable. A return of 8% is justified and adopted (Matter of Trustees of Masonic Hall & Asylum Fund [Liggett Drug Co.], 1N Y 2d 616, supra).
Applying these figures to the statutory formula: Upon adding 8% of $1,075,000, amounting to $86,000, to the taxes and operating expenses of $157,394.78, the fair return to which the landlord is entitled is $243,394.78. Since the computed income heretofore shown amounts to $216,944.46, manifestly there is a $26,450.32 shortage to the landlord on the basis of an 8% return.
Next to be determined is what percentage of the gross rentals from the entire building should be borne by the business space. *170 Beal estate experts for the respective parties differed in their estimates. The landlord’s expert estimated it at 9.01% and the tenant’s at a maximum of 6%. Concededly, it was difficult to make comparisons of the rentals for apartment house office space with other buildings ‘ because the particular offices are so variable in the several factors that affect price ”. In considering what percentage of total increase should be allocated to residential space and what percentage to business space, there is no touchstone to apply other than common sense consideration. As of the time of commencement of this proceeding, the business space rents were 6.76% of the overall rents. I am of the opinion that this alone should not be used as a basis for determination in the instant proceeding. Besidential rents have been strictly controlled. On the other hand, business rents and the rules and regulations pertaining thereto have been constantly liberalized. The statutes regarding business rents have permitted various increases to and decontrol of rents in favor of landlords under various circumstances. With respect hereto, business tenants have been more liberal in agreeing to voluntary increases. Under the circumstances, the business rent must bear a greater percentage to the gross rents than the 6% or the 6.76%, but not as high as 9.01%. I find that 7.5% would be a fair and equitable basis in this particular proceeding and, adopting that percentage, to wit, 7.5% of the gross rentals of $243,394.78, it follows that $18,254.60 should be borne by the business space.
Finally, what proportionate share of this $18,254.60, attributable to all the business space, should be borne by the tenant respondent? There is conflict of opinion and testimony as to the total square footage of the entire office space, as well as of the respective tenants’ individual areas. For the purpose of this proceeding, I adopt the figures submitted by the landlord, which appear to be more reliable than those of the tenant respondent. These figures evidence the total area of business space as being 4,892 square feet, of which 1,622 square feet are occupied by the tenant respondent in the unit known as “A”. As to the relative values of each of the business units as among themselves, in the light of type, desirability, location, size and layout, both real estate experts used one of the offices known as unit “ O ” as the base. Therefore, I do likewise. The landlord’s expert witness was of the opinion that the tenant’s space was 10% more valuable than the base, whereas the tenant’s expert witness estimated it to be 10% less valuable. The tenant’s argument that his unit was originally constructed for residential purposes and is the only office without a separate *171 entrance from the street, is sufficiently overcome by the fact that an entrance on the side street, 120 feet off the Avenue, is not as desirable as a Park Avenue address and Park Avenue entrance with doorman service. Furthermore, the evidence established that many years ago the tenant’s unit was sufficiently and properly converted into the professional unit for which it is used. Thus, I am of the considered opinion that this tenant respondent’s space is equal in value to the base space.
Since the tenant respondent’s percentage of the total business space derives from the ratio between 1,622 square feet and 4,892 square feet, which is 33.156%, the proportionate rent allocable to the tenant respondent is 33.156% of $18,254.60, amounting to $6,052.50 per annum.
Accordingly, I find that the proper proportionate share of the allocable reasonable rent for the space occupied by the tenant respondent is $6,052.50 per annum. The landlord petitioner’s application is granted to the extent of increasing his current rental of $5,000 by $1,052.50 per annum. Said rental increase shall be retroactive to the date of the commencement of this proceeding.
Settle final order in accordance with the findings herein.